**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO. 4:24-561** |
| | § | |
| **ANAS SAID**          § | § | |
|     **Defendant** | § | |

## DEFENDANT'S MOTION TO DISMISS THE INDICTMENT AS VOID FOR VAGUENESS AS APPLIED AND FIRST AMENDMENT GROUNDS

Pursuant to Federal Rules of Criminal Procedure 12(b)(3)(B)(v) and 12(b)(3)(B)(iii), and consistent with the First and Fifth Amendments to the United States Constitution, Defendant respectfully moves this Court to dismiss the Indictment on two independent grounds:

1) First, that the charged conduct constitutes protected independent advocacy under the First Amendment, and that the government has not, and cannot, allege that Said acted in coordination with ISIS, an element § 2339B and the First Amendment jointly require; and

2) Second, that 18 U.S.C. § 2339B is unconstitutionally vague as applied to the conduct charged because no court has defined, and the statute itself does not provide, an intelligible standard for distinguishing the criminal coordination the statute requires from the protected independent advocacy it expressly excludes. And that, in the alternative, any ambiguity must be resolved in Defendant's favor under the rule of lenity.

1

## SUMMARY OF THE ARGUMENT

The government has charged Said under 18 U.S.C. §§ 2339B and 2 with knowingly attempting to provide material support and resources—to wit: personnel (himself) and services, including producing videos and propaganda—to the Islamic State of Iraq and al-Sham (ISIS). In its Memorandum in Support of Detention, the government states that Said is charged "with attempting to provide material support and resources, namely personnel (himself) and services, to ISIS in relation to his production of pro-ISIS videos and propaganda at the direction of and in coordination with an individual who represented himself to Said as the 'number 2' designer for the 'Dawlah.'" ECF No. 8, at 7.

This charge suffers from two independent and overlapping constitutional infirmities. First, the material support statute, properly construed, reaches only conduct directed to, coordinated with, or controlled by ISIS itself. The Supreme Court in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*"), was explicit: the statute does not prohibit independent advocacy of any kind; it prohibits only a narrow category of speech performed in coordination with or at the direction of a designated foreign terrorist organization. *See* 561 U.S. 23-24. Here, the government's own evidence establishes that Said's conduct occurred entirely within an independent online fanboy community that had no operational connection to any ISIS official media organ. The government's coordination theory rests on its mischaracterization of a Telegram screen name, namely Number 2 designer, as an ISIS organizational rank. But the underlying evidence does not support this reading. Absent any actual coordination with or direction by ISIS, the charged conduct is

constitutionally protected expression under the First Amendment, and prosecution must be dismissed.

Second, even if this Court were to conclude that some coordination existed, the statute is unconstitutionally vague as applied to this conduct. The Supreme Court in HLP acknowledged openly that the statute poses "difficult questions of exactly how much direction or coordination is necessary" to constitute a prohibited 'service,' and expressly declined to resolve those questions. No court has since drawn that line. Where the governing authority leaves the boundary undefined, and where the conduct alleged sits precisely at that undefined margin, the statute fails to give a person of ordinary intelligence fair notice that the conduct was criminal and fails to provide the minimal guidelines necessary to prevent arbitrary enforcement. The Due Process Clause of the Fifth Amendment requires dismissal on this independent ground as well.

## STATUTORY FRAMEWORK

Section 2339B(a)(1) prohibits the knowing provision of "material support or resources" to a designated foreign terrorist organization, or any attempt or conspiracy to do so. 18 U.S.C. § 2339B(a)(1). "Material support or resources" encompasses any property or "service." 18 U.S.C. § 2339A(b)(1). The statute does not define "service."

The statute expressly limits criminal liability with respect to personnel:

> No person may be prosecuted under this section in connection with the term 'personnel' unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist

3

organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

18 U.S.C. § 2339B(h) (emphasis added).

This exclusion for independent actors is not a peripheral carve-out. It is the structural limit Congress built into the statute to preserve constitutionally protected expression. In *HLP*, the Supreme Court read the undefined term "service" consistently with this limit: because Congress expressly excluded independent actors from the "personnel" definition, and because other enumerated items of material support—such as "lodging," "weapons," and "transportation"—cannot by their nature be provided independently of an organization, "service" must be read along the same lines. *HLP*, 561 U.S. at 23. The statute therefore does not prohibit "independent advocacy" of any kind. Id. at 24. The provision of material support must also be "knowing"—the defendant must have knowledge that the organization is designated or engages in terrorism. 18 U.S.C. § 2339B(a)(1); *United States v. Osadzinski*, 97 F.4th 484, 491 (7th Cir. 2024).

Section 2339B also contains an express constitutional savings clause: "Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the [U.S.] Constitution." 18 U.S.C. § 2339B(i); *Osadzinski*, 97 F.4th at 491.

## STATEMENT OF FACTS

### A. The FBI's Seven-Year Investigation Produced No Evidence of Coordination with ISIS

Although the government first encountered Said in 2016, it was not until November 8, 2024, eight years later, that the government arrested him, charging him with attempted material support to ISIS.

On June 21, 2016, the FBI interviewed a confidential human source regarding the defendant. The witness stated that he encountered Said at the community college and that Said held unusual views regarding Islam.

On October 24, 2017, the FBI received a tip from a manager at a printing café who reported a printing order for two allegedly pro-ISIS stickers. The printing press declined to print them. Said had intended to display the stickers in his bedroom.

On January 10, 2018, the FBI interviewed Said at his family's apartment. Said repeatedly stated that he did not support ISIS or any terrorist group and had no intention of harming anyone. He explained that the stickers reflected support for the Palestinian people. He explained that he watched CNN and Al Arabia news online and remained affected by the videos of Muslim women and children being killed. At that time, Said was employed as a stocker and was attending community college. Although he was born in Houston, Said's family had taken him and his brother back to Tripoli, Lebanon, where he lived for 18 years. In 2014, Said, his brother, Mahmoud, and his mother, Taghrid Awad, returned back to Houston. During his time in Lebanon, Said and his family had lived in refugee camps and endured significant poverty and food insecurity.

On January 29, 2018, the FBI conducted a second interrogation to again inquire into the meaning of the stickers. Subsequent FBI interviews took place on March 7, 2018, May

14, 2018, and April 1, 2019. During these interviews, Said consistently described his focus on education and employment. By April 2019, he told agents he was no longer consuming political or propaganda content online and had no plans related to ISIS activity. After its April 2019 interview, the FBI did not approach Said again for over three years. Throughout this period, the FBI interviewed multiple witnesses including Said's mother, brother, uncles, employer, professor, and classmate, issued subpoenas, installed a pen register/trap-and-trace device, and obtained Said's financial records. None of this investigation produced evidence that Said coordinated with, communicated with, or acted under the direction of ISIS or any ISIS-affiliated entity.

**B. Said's Online Activity Occurred Within an Independent Pro-ISIS Support Community (Protected Activity)**

At some point, the government enlisted confidential human sources (CHSs) and online covert employees (OCE) to investigate Said. Based on discovery provided to date, Said's documented conversations with the OCE began in October 2023.

Throughout their conversations, the OCE repeatedly questioned Said about his views on guns, ISIS, making hijrah, graphic design, and carrying out an unspecified "operation." Said repeatedly declined to act on these inducements. He offered various explanations for his inaction—his mother's health, his family's presence in Texas, his work and school obligations. The OCE themselves noted that Said appeared "distraught" at times and would disappear from online conversation with OCE for days.

6

**C. The Telegram Groups Were Independent Online Circles, Not ISIS Official Media Accounts**

The evidence shows that Said was a member of a Telegram group called "the Dawla Designer." "Dawla" means "state;" "Dawlawi" is the adjectival form. Use of ISIS-adjacent terminology in a Telegram group name is insufficient to establish any operational relationship with the Islamic State as an organization. The group contained multiple subgroups including "The Designers" and "The Designers Gathering." The stated purpose of the group was to "help pro-ISIS designers master graphic designing."

The government's core coordination theory rests on the claim that Said produced propaganda at the "direction" of an individual who was the "number 2 designer for the Dawlah"—i.e., ISIS. That characterization is factually unsupported.

7



When another group member asked why two similar accounts existed—"Al-Dawlawi Designer 2" and "Al-D9wl9wi Designer 2," the individual responded: "They're all mine I'm Amu Humam. I have a lot of accounts and sometimes I am busy with an account so I'm late in replying." This statement explains the existence of multiple accounts belonging to one person. It says nothing about any role within ISIS. When Said himself asked in a separate private chat, "You're Al-Dawlawi Designer 1, right?" the user responded: "I am (number) 2." Serial 452. Read in context, this refers to the user's Telegram screen-name designation, not to any rank within ISIS's organizational hierarchy.

8

ISIS operates through formally designated official media organs. Al-Furqan Media Foundation, Al-Hayat Media Center, and Amaq News Agency are ISIS's official media organs. *See Amendments to the Terrorist Designations of the Islamic State of Iraq and Syria*, U.S. STATE DEP'T. (Mar. 21, 2019), https://2017-2021.state.gov/amendments-to-the-terrorist-designations-of-the-islamic-state-of-iraq-and-syria/.       No     government allegation links the Telegram group to any known ISIS official media structure.

None of those official structures is the Telegram group at issue. The government has not alleged, and cannot establish, that this Telegram group was affiliated with any ISIS official media organ or that it operated within ISIS's command structure. The government itself acknowledges that "Sarh al-Khilafah"—the separate outlet to which Said allegedly sent one video—was not an ISIS organ but an independent support group: per the government's own discovery, the November 2022 statement attributed to that group was issued jointly by three independent pro-ISIS propaganda groups, not by ISIS. An independent pro-ISIS support group is not ISIS; sending material to such a group does not constitute coordination with ISIS. Just as any independent pro-Democrat blog site is not itself the Democratic Party's official media, sending material to the independent blog also does not constitute coordination with the Democratic Party.

There is no evidence that any member of the Designers group—Abu Humam, Designer 2, or any other participant—was directly part of or working with ISIS. There are no communications suggesting that Said believed any of these individuals, groups, or accounts were directed by or coordinated with ISIS.

9

**ARGUMENT**

**I. THE CHARGED CONDUCT IS CONSTITUTIONALLY PROTECTED INDEPENDENT ADVOCACY UNDER THE FIRST AMENDMENT, AND PROSECUTION MUST BE DISMISSED.**

**A. The Legal Framework: *HLP* and the Boundary Between Protected Independent Advocacy and Criminal Material Support**

The Supreme Court's controlling authority on the scope of § 2339B and its relationship to the First Amendment is *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ("*HLP*"). *HLP* drew a firm constitutional line between the category of conduct protected under the First Amendment and that which § 2339B prohibits.

On one side of the line lies conduct performed in coordination with, or at the direction of, a designated foreign terrorist organization. This is what § 2339B bars. Congress may prohibit such conduct consistent with the First Amendment. *See HLP*, 561 U.S. at 26. The Court reasoned that even peaceful or expressive assistance provided in direct coordination with an FTO—such as advising it on how to use international law—could free up the organization's resources for violent activities, and that FTOs do not maintain operational firewalls between their lawful and unlawful conduct. *See Id.* at 29–33. As a result, such conduct can be constitutionally restricted.

However, on the other side of that line lies independent advocacy. The Court was unequivocal: "any independent advocacy in which plaintiffs wish to engage is not prohibited by § 2339B." *HLP*, 561 U.S. at 4. A person remains free to "say anything they wish on any topic" including terrorism, to "vigorous[ly] promot[e] and support[] the political goals" of a designated FTO, and to engage in any expressive activity that is not

directed to, coordinated with, or controlled by the FTO itself. *Id.* at 25–26, 39. The Court confirmed that its holding "in no way suggest[s] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations." *Id.* at 39.

The Court read the statutory term "service" consistently with this constitutional limit. Because Congress expressly excluded independent actors from the "personnel" definition, and because other enumerated items of support cannot by their nature be provided independently of an organization, "service" must be read to require coordination with or direction by the FTO. *HLP*, 561 U.S. at 23–24. A conviction under the "services" theory requires proof of concerted activity between the defendant and the FTO. *Id.* As the Seventh Circuit explained in *Osadzinski*, the material support statute prohibits "only a narrow category of speech" that falls outside the protection of the First Amendment, "speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *United States v. Osadzinski*, 97 F.4th 484, 491 (7th Cir. 2024) (summarizing *HLP*).

Crucially, *HLP* also confirmed that the government cannot circumvent the independent-advocacy protection by arguing that independent speech "legitimizes" an FTO and therefore constitutes material support. The Court rejected that theory explicitly: the legitimacy rationale operates only where there is actual coordination between the defendant and the FTO. Independent advocacy that happens to promote an FTO's goals or enhance its standing does not become material support merely because it benefits the

organization. *See HLP*, 561 U.S. at 39. The government cannot convert expressive activity into a crime by characterizing it as a "service" when the activity is self-initiated, independently produced, and unconnected to any operational structure of the FTO.

### B. The "In Coordination" Requirement: The Level of Coordination Courts Have Found Sufficient

To convict under § 2339B's personnel bar, an individual must have been "working under the foreign terrorist organization's direction and control." *HLP*, 561 U.S. at 23-24 (internal citation omitted). Similarly, § 2339B's bar against providing services to an FTO also refers to "concerted activity," between the defendant and the foreign terrorist organization. *Id.* at 23-24. A conviction under "services" often requires "proof of particular engagement or activity" while a conviction under "personnel" "focuses on submission to the direction and control of a terrorist organization." *See United States v. Farhane*, 634 F.3d 127, 152 (2d Cir. 2011). In this case, the government has not proved any level of coordination.

Cases in which courts have found the coordination requirement satisfied share a common, defining feature, one not present in this case: the defendant had actual, identifiable contact with a person he understood to represent or speak for the FTO itself—such as a recruiter, an official operative, an organizational intermediary—and the defendant's conduct was traceable to that organization's own direction, request, or call to action. *See e.g., Osadzinski*, 97 F.4th 484 (7th Cir. 2024); *United States v. Carpenter*, No. 3:21-CR-38-KAC-DCP, 2022 U.S. Dist. LEXIS 220562 (E.D. Tenn. Aug. 25, 2022); *United States v. Farhane*, 634 F.3d 127, 133 (2d Cir. 2011).

In *Osadzinski*, the Seventh Circuit affirmed a § 2339B conviction where the defendant **"**closely coordinated his activity with ISIS and its media office" and contributed to "official videos and provid[ed] them with a software tool to organize, duplicate, and disseminate media to a wider audience." *Osadzinski*, 97 F.4th 484, 493 (7th Cir. 2024). The defendant also invited undercover agents to connect him with ISIS's official media bureau; taught agents his program specifically so they could relay it back to ISIS members; and wrote step-by-step instructions titled "Heralds of the Internet" for ISIS supporters to disseminate official ISIS media. *Id.* at 487–89. The Seventh Circuit concluded that this defendant had "effectively fus[ed] his voice with that of ISIS's media bureaus." *Id.* at 495.

In *Carpenter*, the government's OCE explicitly represented himself to the defendant as a member of ISIS's "diwan"—the centralized ISIS organization that produces and initially disseminates ISIS media. The defendant believed he was dealing with an ISIS-connected operative, and the court's coordination analysis turned on that representation. *See* No. 3:21-CR-38-KAC-DCP, 2022 U.S. Dist. LEXIS 220562 (E.D. Tenn. Aug. 25, 2022).

In *Farhane*, the undercover agent expressly identified himself as a recruiter for al-Qaeda, and the defendant agreed to provide medical assistance to wounded mujahideen operating in Saudi Arabia—a direct operational commitment to the FTO. *See* 634 F.3d 127, 133 (2d Cir. 2011).

The common thread in each case is a direct, operative link to the FTO's own structure: a recruiter, a media operative, a formal organizational intermediary. No such link

13

is present here, there is no evidence that any user—whether the OCE, the alleged Sarh al-Khilafah Telegram group, or the Designers Telegram chat members—ever stated to Said that they were official ISIS members, media operatives, or formal organizational intermediaries. None of them indicated that they were being directed by or coordinating with ISIS or any of its official departments.

### C. The Charged Conduct Is Independent Advocacy: There Is No Coordination with ISIS

Measured against these standards, Said's charged conduct—creating graphic images and a video within an independent online fanboy follower community and sharing one video with another independent support group, constitutes independent advocacy, not material support.

First, Said had no direct communication with ISIS or any ISIS operative. No ISIS official directed his work. No ISIS media organ acknowledged his content, requested it, or incorporated it into any official ISIS publication. ISIS had, and has, no knowledge of whether Said heard its messaging or acted on it, and would have had no recourse if he had ignored it entirely. *See United States v. Ullah*, No. 21-1058, 2026 LX 127905, at *15 (2d Cir. Apr. 21, 2026) (explaining that ISIS must have some knowledge that the defendant exists and is working under its command for conduct to constitute coordination).

Second, the Telegram groups through which Said operated were independent online communities, not nodes in ISIS's command structure. The government does not allege—and cannot establish—that these groups were affiliated with any ISIS official media organ, preventing this conduct from qualifying as coordination. As the government's own

evidence confirms, even "Sarh al-Khilafa," the outlet to which Said sent one video—was not an ISIS organ but an independent pro-ISIS support group formed by the merger of three independent propaganda networks. *See* ECF No. 8, at 8 fn. 10. Providing content to an independent support group does not constitute providing material support to the FTO. *HLP* is explicit on this point: independent advocacy that promotes the FTO's goals or legitimacy, without coordination with the FTO itself, is not criminal. *See HLP*, 561 U.S. at 39 (Court's holding "in no way suggest[s] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations.").

Third, the government's "number 2 designer" theory fails on its own terms. The government's coordination allegation rests on the claim that Said was working at the direction of an individual who was the "number 2 designer for the Dawlah"—or, ISIS. But the evidence does not support that reading. The individual identified himself as "Amu Humam" and explained that his screen name referred to his own Telegram account designations: "They're all mine I'm Amu Humam. I have a lot of accounts and sometimes I am busy with an account so I'm late in replying." When Said asked if the user was "Al-Dawlawi Designer 1," the response, "I am (number) 2," referred to the screen name "Designer 2," not to any rank within ISIS. The government extracts isolated words from their obvious context to manufacture an inference of organizational affiliation. Serial 452. The most natural, contextually supported reading is that these participants were discussing Telegram account names, not ISIS titles.

Even accepting, counterfactually, that this individual had some prior connection to ISIS-related content creation, that would not establish that Said's independent graphic work was performed under the direction and control of ISIS. Under *HLP*, the relevant question is not whether Said interacted with a person who had FTO connections, but whether Said's own conduct was directed or controlled by the FTO itself. *See HLP*, 561 U.S. at 36. It was not.

Moreover, the inference the government draws is implausible on its face. ISIS operates through formally designated media organs with known, established infrastructure. If this individual were truly an official ISIS media functionary, there is no reason why he would be running a loosely organized independent Telegram group of self-described graphic design enthusiasts rather than working through ISIS's own official channels. The government's theory requires the Court to accept that ISIS's own media operative would be conducting ISIS business through an unaffiliated, independent online group chat—a proposition the government's own evidence does not support.

### D. The Second Circuit's Decision in *Ullah* Is Consistent with This Analysis and Reinforces the Independent-Advocacy Boundary

A recent Second Circuit decision, *United States v. Ullah*, No. 21-1058 (2d Cir. Apr. 21, 2026), provides the most directly on-point appellate analysis of § 2339B's coordination requirement. In *Ullah*, the Second Circuit reversed a § 2339B material support conviction where the defendant had consumed ISIS propaganda online, self-radicalized, adopted ISIS slogans, told investigators he acted on behalf of the Islamic State, and detonated a pipe bomb in a New York transit station. *Id*. at 6-8. Notwithstanding those operationally

significant facts, the court held the evidence insufficient to find that he worked in coordination with and under the direction of ISIS. *Id*. at 3-4.

The Second Circuit held, "a person cannot 'work under [ISIS's] direction or control' if he is acting alone, and if ISIS does not know he exists, has no expectation he will hear ISIS's messages or act on them, and will not know, or care, or have any recourse if he ignores the message completely." *Id*. at 15. "A contrary interpretation," the court held, "would render Congress's exclusion of 'entirely independent' actors nonsensical." *Id*. at 17. The court applied this analysis to both the "personnel" theory and the "service" theory, finding the evidence insufficient under each prong. The court also distinguished prior convictions affirmed in cases such as *Farhane* on the ground that those defendants had attempted to expressly *join* the organization or coordinate directly with its operatives, precisely the kind of direct connection absent here.

*Ullah* establishes that proof of § 2339B requires more than ideological alignment, more than self-motivated action taken in the belief one is serving an FTO, and more than consuming or responding to the organization's publicly broadcasted material. Even a defendant who actually carried out a bombing in ISIS's name while subjectively believing he was acting for ISIS, lacked the required coordination because ISIS had no knowledge of or relationship with him. As a result, it follows that creating media content within an independent online group, with no operative link to any ISIS official structure or any evidence that ISIS is aware of the defendant's activities, does not satisfy the coordination

17

requirement. *See Id*. at 16 ("Indeed, ISIS could hardly provide 'guidance or supervision' of an individual without knowledge of that individual's existence.").

## II. IN THE ALTERNATIVE, SECTION 2339B IS UNCONSTITUTIONALLY VAGUE *AS APPLIED* TO THE CONDUCT CHARGED.

The material support statute is unconstitutionally vague *as applied* to the charged conduct because no court has defined the line between criminal coordination and protected independent advocacy that the statute suggests, and no citizen of ordinary intelligence could have known that Said's alleged conduct crossed that undefined line into criminal territory.

### A. Legal Standard: Pretrial Vagueness Challenges Are Cognizable in the Fifth Circuit

Rule 12(b)(2) of the Federal Rules of Criminal Procedure provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Civ. P. 12(b)(2). The court is required to take the indictment's allegations as true when determining whether the indictment fails to state an offense. *United States v. Crow*, 164 F.3d 229, 234 (5th Cir. 1999). In addition, in considering whether to grant the motion to dismiss the indictment based on its sufficiency for failure to state an offense, "the propriety of granting a motion to dismiss the indictment under Rule 12 'is by and large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact.'" *United States v. Rainey*, 946 F.Supp.2d at 526 (citing *United States v. Flores*, 404 F.3d 320, 324 (5th Cir.2005)). In the Fifth Circuit, questions of law are considered appropriate for such pretrial motions. *Id*. In

18

the instant matter, whether the criminal statute is unconstitutionally vague as applied to Said is a question of law. *United States v. Rudzavice*, 586 F.3d 310, 315 (5th Cir. 2009) ("Whether a criminal statute is unconstitutionally vague is a question of law..."); see *Rainey*, 946 F.Supp.2d at 546. Additionally, unlike some other circuits, the Fifth Circuit allows district courts to look beyond the face of the indictment and make "preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *Flores*, 404 F.3d at 324 n.6 (citation and internal quotations omitted).

"The Fifth Amendment's Due Process Clause protects against criminal convictions based on impermissibly vague statutes." *United States v. McRae,* 702 F.3d 806, 836-37 (5th Cir. 2012). Generally, the void for vagueness doctrine provides that the statute may be vague based on two independent grounds: (1) where persons of ordinary intelligence have no fair notice or reasonable opportunity to understand what conduct is proscribed, and (2) where the statute prohibits conduct in such a manner that it encourages arbitrary and discriminatory enforcement. *See Kolender v. Lawson,* 461 U.S. 352, 35 (1983); *United States v. Williams*, 553 U.S. 285, 304 (2008); *Grayned v. City of Rockford,* 408 U.S. 104 (1972). The first ground is founded upon the notion that "[v]ague laws may trap the innocent by not providing fair warning." *Grayned,* 408 U.S. at 108-09; *see Thibodeau v. Portuondo,* 486 F.3d 61, 65 (2007). Even if the law provides fair notice, however, it may be impermissibly vague if it does not provide sufficiently clear standards for enforcement. *See Chicago v. Morales,* 527 U.S. 41, 52 (1999). The second ground—of which the

19

Supreme Court has declared is the "more important aspect of the vagueness doctrine"—requires that laws must establish "minimal guidelines to govern law enforcement." *Kolender, 461 U.S. at 359*. To protect against arbitrary enforcement, the laws must establish "explicit standards" that avoid "resolution based on an *ad hoc* and subjective basis," or those resolutions which are accompanied by the "attendant dangers of arbitrary and discriminatory application." *Grayned, 408 U.S. at 109*.

### i.    *Void for Vagueness As Applied Doctrine*

Challenges as to vagueness are of two types: they may be facial, seeking invalidation of the statute in its entirety, or as applied, seeking invalidation only as applied to the facts *sub judice. See Steffel v. Thompson,* 415 U.S. 452, 474 (1974).

The statute may be vague as applied if the defendants show that they could not have reasonably understood that their alleged conduct or behavior was proscribed by the statute. *See United States v. Kelly*, 973 F.2d 1145, 1152 (5th Cir. 1992); *Maynard v. Cartwright*, 486 U.S. 356, 361, (1988) ("Objections to vagueness . . . may be overcome in any specific case where reasonable persons would know that their conduct is at risk.").

Whether a criminal statute is unconstitutionally vague is a question of law. *Rudzavice*, 586 F.3d at 315 (5th Cir. 2009). A motion to dismiss based on vagueness is therefore cognizable under Federal Rule of Criminal Procedure 12(b)(3)(B).

As the Supreme Court has explained, what renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact has been proved, but rather "the indeterminacy of precisely what that fact is." *United States*

*v. Williams*, 553 U.S. 285, 306 (2008). The vagueness problem here is definitional, not evidentiary: the statute does not define, and no court has defined, how much connection between a defendant and an FTO is required to convert independent expressive activity into prohibited "concerted activity."

### B. A Heightened Vagueness Standard Applies Because the Charged Conduct Is Expressive

Where a statute potentially reaches protected speech or association, a more stringent vagueness standard applies. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *HLP*, 561 U.S. at 18. This heightened standard applies here because the charged conduct—creating and sharing graphic images and video within an online community—is, on its face, expressive activity within the meaning of the First Amendment. The Seventh Circuit in *Osadzinski* accepted without reservation that creating and sharing media online constitutes "speech" for First Amendment purposes, including "writing an article and instruction manual, forwarding multimedia links, and sending pro-ISIS messages over social media." *Osadzinski*, 97 F.4th at 491 (citing *Packingham v. North Carolina*, 582 U.S. 98, 104–05 (2017)).

Vague laws that touch on expression carry a chilling effect beyond the individual case. Citizens who cannot determine whether their speech is prohibited will self-censor rather than risk prosecution. The heightened standard therefore requires that the statute give clear notice that the specific expressive conduct charged—not just some general category—falls on the criminal side of the line.

### C. The Material Support Statute Provides No Intelligible Standard for Distinguishing Criminal Coordination from Protected Independent Advocacy as Applied to The Conduct In this Case

The Supreme Court in *HLP* acknowledged explicitly that the material support statute "poses difficult questions of exactly how much direction or coordination is necessary for an activity to constitute a 'service,'" and declined to resolve those questions, stating that "adjudication of the reach and constitutionality of [the statute] must await a concrete fact situation." *HLP*, 561 U.S. at 24 (quoting *Zemel v. Rusk*, 381 U.S. 1, 20 (1965)). That concrete fact situation is now before this Court.

*HLP* further reserved judgment on specific outer-bounds questions: whether any communication with a single FTO member would suffice; whether communication with a leader would suffice; whether the relationship must have formal elements such as employment or contract; and what a relationship through an intermediary would require. *HLP*, 561 U.S. at 24. None of these questions has been answered. The statute's coordination threshold thus remains undefined.

The Seventh Circuit in *Osadzinski* acknowledged the same gap—even after affirming a conviction involving direct operational coordination with ISIS's official media bureaus. The court stated that "[t]he line dividing concerted conduct from independent advocacy will doubtless emerge as courts continue to consider challenges to convictions under § 2339B," and held only that the defendant's conduct "clearly falls on the proscribed side of that line." *Osadzinski*, 97 F.4th at 494. Even in that stronger case, the court declined to define where the line falls. No court has done so.

As applied to Said's conduct—creating original graphic images and a video within an independent online group that had no operational connection to ISIS, and sharing one video with another independent support group that itself lacked any operational ISIS tie— the statute provides no intelligible standard. The government cannot point to any direct communication with ISIS, any operative relationship traceable to ISIS's command structure, or any instance in which ISIS directed, requested, or acknowledged Said's content. Yet it seeks a criminal conviction under a statute whose reach into this category of conduct has never been defined. A citizen of ordinary intelligence reviewing Said's conduct could not have known—because no court has determined—whether it constitutes prohibited coordination or protected independent advocacy.

### D. The Government's Own Theory Illustrates the Statute's Vagueness Problem

The government's coordination theory illustrates the vagueness problem directly. The government interprets the Telegram designation "Designer 2" as evidence of an ISIS organizational rank. The record, in context, shows only a screen name. The government interprets sending a video to an independent pro-ISIS group as providing material support to ISIS. *HLP* states that doing such an act—without coordination with the FTO itself—is not criminal. The statute provides no standard by which a court, let alone a citizen, could resolve which interpretation is correct.

This interpretive elasticity is not a strength of the government's case—it is an alarming gap that highlights the vagueness problem. When the government must stretch ambiguous language to reach a defendant's conduct, and when no legal standard exists to

23

distinguish the government's interpretation from the defendant's, the statute does not provide the "explicit standards" the Due Process Clause requires. *Grayned*, 408 U.S. at 109. The risk of arbitrary enforcement is greatest where, as here, the government has extended the statute's reach beyond its acknowledged core—direct operational support coordinated with the FTO itself—and into territory the statute's text, legislative history, and the Supreme Court's own construction have all left undefined. Applying § 2339B to this conduct, without a principled standard distinguishing it from protected independent advocacy, is precisely the kind of ad hoc enforcement the vagueness doctrine prohibits.

### E. The Rule of Lenity Independently Compels Dismissal

Even if this Court finds no constitutional infirmity, the rule of lenity provides an independent basis for dismissal. Where a criminal statute is genuinely ambiguous as to whether particular conduct is prohibited, courts must resolve that ambiguity in the defendant's favor. *See United States v. Bass*, 404 U.S. 336, 347–48 (1971). *HLP* itself acknowledged that "gradations of fact or charge would make a difference as to criminal liability" in this area—an acknowledgment that the statute's reach is genuinely uncertain. *HLP*, 561 U.S. at 24. Where the statute provides no intelligible standard for treating the charged conduct as a prohibited "service" rather than protected independent advocacy, and where the consequences of a criminal conviction are severe and irreversible, lenity compels resolution in Said's favor. *See United States v. Santos*, 553 U.S. 507, 514 (2008) (explaining that the rule vindicates that "no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is

not clearly prescribed" and "places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead.").

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court dismiss Count 1 of the Indictment on two independent constitutional grounds: first, that the charged conduct is protected independent advocacy under the First Amendment because the government has not and cannot allege the coordination with ISIS that § 2339B requires; and second, that § 2339B is unconstitutionally vague *as applied* to the charged conduct because the statute's critical boundary between criminal coordination and protected independent advocacy has never been defined, and no citizen of ordinary intelligence could have known that Defendant's conduct—creating and sharing original expressive content within an independent online community with no operational connection to ISIS—crossed that undefined line into criminal territory.

Respectfully submitted,

/s/ *Sufia M. Khalid*
SUFIA M. KHALID
*Deputy Director, NSCDC*
Muslim Legal Fund of America
100 N. Central Expy., Suite 1010
Richardson, Texas 75080
972-914-2507 (Office)
sufia.khalid@mlfa.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served on counsel for the United States in accordance with the Federal Rules of Criminal Procedure on May 22, 2026.

/s/ *Sufia M. Khalid*
SUFIA M. KHALID

25