| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO.: 4:24-cr-561 |
| | § | |
| ANAS SAID | § | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT

COMES NOW, the United States of America, by and through the United States Attorney for the Southern District of Texas, and files the following response to the Defendant's *Motion to Dismiss Indictment as Void for Vagueness as Applied and First Amendment Grounds*. The Government respectfully requests that the Court deny the Defendant's motion because, consistent with the Supreme Court's ruling in *Holder v. Humanitarian Law Project ("HLP")*, 561 U.S. 1 (2010), (1) the indictment complies with the First Amendment; and (2) in accordance with 18 U.S.C. §2339B and the Fifth Amendment, the defendant was aware his conduct was legally restricted when he knowingly attempted to coordinate with and work at the direction of a foreign terrorist organization.

## THE CHARGED CONDUCT AND OTHER RELEVANT FACTS

The Defendant Anas Said ("SAID") is charged in a one count indictment with attempting to provide material support or resources to ISIS, a designated foreign

terrorist organization, in the form of "personnel (himself)" and "services, including producing videos and propaganda" from between in or about January 2017 to in or about October 2024, in violation of 18 U.S.C. § 2339B. Dkt. 1. The basis for the charge is further described in the *Government's Memorandum in Support of Detention* (Dkt. 8), which the Government incorporates in this response. In short, the FBI developed information during the course of its investigation indicating that SAID sought to fight for ISIS abroad or engage in an attack in the United States, but also that SAID communicated online with another individual, who represented himself as the "number 2" designer for the "Dawlah"[1] (the "Designer") in late 2023 and early 2024, to create ISIS propaganda. Specifically, on December 11, 2023, SAID wrote to the Designer via an encrypted messaging application and stated, "Brother, I edited the clip based on your comments. You are the number 1 designer for the Dawlah [Islamic State], right?" The Designer responded, "I am number 2. No worries, we are all one. Send it."

The FBI recovered this and other communications from SAID's electronic devices indicating that between December 2023 and February 2024, SAID created and edited multiple videos with pro-ISIS propaganda based on the direction and feedback of the Designer. The ISIS propaganda that SAID created and edited with

---

[1] Dawlah is another name for ISIS. "Dawla al Islamiya" is also a designated alias of ISIS.

the Designer incorporated other existing official ISIS propaganda and glorified ISIS's violent attacks on its perceived enemies. For example, one ISIS propaganda video that SAID created and sent to the Designer in February 2024 including a quote by the former ISIS spokesperson in which the ISIS spokesperson stated, "I renew the call to all monotheists in Europe, the infidel West, and everywhere, target the crusaders inside their homes and wherever you find them … whether by an IED, a bullet or a knife, a vehicle, or a rock, or even with a kick or a punch." *See* Dkt. 8 at 16.

As the encrypted communications between SAID and the Designer indicate, SAID's creation of this ISIS propaganda was not done independently, and SAID implemented substantive and design changes to the propaganda based on specific direction that the Designer provided. For example, the Designer provided the below direction with respect to a pro-ISIS image SAID created and sent to the Designer for review:

> Look at these elements. Not every one of them needs to appear completely in the design, but you can put them in the front and back to back of each other. This way you will reduce the dimension of the design and make it more professional. That way the logo of the dawlah can be hidden completely behind the design because it is not as important as the title above. Also the world map, it can appear behind the two brothers and in front of it the explosion but with less transparency, it does not need to remain fully visible. Also the pictures of the coffins, you don't have to make them fully visible, but it is enough to

> show a small part of them where the viewer can understand that they pertain to funerals.

*See* Dkt. 8 at 15. SAID also sent this ISIS propaganda to others, including an ISIS media outlet called Sarh al-Khilafah, for wider distribution. In addition, as SAID later admitted in his post-Miranda interview with the FBI, he established an encrypted chat group where he coordinated with other ISIS followers to translate and distribute ISIS propaganda in other languages. In short, he attempted to work at the direction of and in coordination of ISIS, including the Designer—all while understanding that his conduct was criminal—thereby falling within the activity that is properly criminally prescribed in section 2339B, according to the Supreme Court's decision in *HLP*. *See also United States v. Osadzinski*, 97 F.4th 484, 491 (7th Cir. 2024) (affirming section 2339B conviction for defendant whose offense conduct included "writing an article and instruction manual, forwarding multimedia links, and sending pro-ISIS messages over social media," and the "creation, execution, and distribution of [computer] source code"); *United States v. Al Safoo*, No. 18 CR 696, 2025 WL 1331682 (N.D. Ill. May 7, 2025).

## Investigation and Social Media

The FBI's investigation of SAID began on or about October 24, 2017, after the FBI received a tip that SAID had placed an order for two stickers: one containing

a photograph of the Dome of the Rock[2] with a photograph of the Islamic State of Iraq and al-Sham ("ISIS") flag overlayed, and another showing the white silhouette of a man holding a rifle with the caption, "Winning the Islamic Nation." SAID was interviewed by FBI and ultimately the case was closed after SAID claimed that he was no longer involved in the consumption of radical Islamic propaganda.

The investigation was subsequently reopened and on approximately October 18, 2023, pursuant to legal process, FBI received information from Meta regarding eleven Facebook accounts used by SAID that showed SAID continued to support ISIS and its radical causes.

On or about July 24, 2023, SAID uploaded onto one of his Facebook accounts a video and status in Arabic[3] which translated to, "News about the fight between the Islamic State fighters and PKK[4] that led to the death of one of the PKK's soldiers." The video depicts the logo for Amaq News Agency, an official ISIS media outlet. The video shows the shooting of a member of the PKK by members of ISIS. The following week SAID posted uploaded video and status in Arabic which translated

---

[2] The Dome of the Rock is an Islamic shrine at the center of the Al-Aqsa Mosque compound on the Temple Mount in the Old City of Jerusalem.
[3] Multiple conversations detailed in this memorandum occurred in Arabic. In most cases, an FBI Linguist conducted a preliminary translation from Arabic to English, although in other cases, the Arabic to English translation was conducted by Meta Platforms, Inc.
[4] The PKK is the Kurdistan Workers Party. Based on open-source information, the PKK fought against ISIS in Iraq and Syria.

to, "The Islamic State fighters attack the barrack of the Mozambique Forces in Macomia and seize their weapons." The video depicts a cache of a variety of weapons, ammunition, and cell phones, with the ISIS flag displayed in the background.

The following month, August 2023, SAID, using one of his Facebook accounts, pledged his allegiance to ISIS, stating:

> Blessings to you, our Sheikh Abu-al-Hasan al-Husayni.[5] You gained what you wanted. I ask that Allah bring us together in His paradise when Allah destines and in obedience to His Messenger and to anger his enemies. We declare our pledge of allegiance to the Emir of all Believers and the Caliph of the Muslims, the mujahid Sheikh Abu Hafs al-Hashimi,[6] may Allah protect him. We pledge to listen and obey in good and evil, in easy times and hard times and not to oppose unless we see blatant kufr [infidelity] with evidence from Allah. We pledge obedience as much as we can. May Allah be our witness and Praise be to Allah.[7]

### Seeking Permission to Fight for ISIS

The records obtained from Meta for the Facebook accounts attributable to SAID revealed numerous communications in which SAID expressed his desire to conduct a violent attack on behalf of ISIS. On or about July 4, 2023, SAID, using Facebook, asked another user, "Can you give me the green light? I am like anyone

---

[5] Sheikh Abu-al-Hasan al-Husayni was the leader of ISIS from in or about November 2022 to when he died in or about April 2023. When SAID states, "You gained what you wanted," it is believed he is referring to Sheikh Abu-al-Hasan al-Husayni dying as a martyr for Allah.
[6] Sheikh Abu Hafs al-Hashimi was declared the leader of ISIS in August 2023, and is its current leader.

who fights for the sake of Allah not for the sake of borders." On that same day, SAID sent another Facebook user screenshots which appeared to depict a conversation on Facebook Messenger between SAID and the Al Faris Media Institute (which is the main Southeast Asian ISIS media channel). In that message, SAID inquired about travelling to fight on behalf of ISIS, stating, "[P]eace be on you brother, how are you? I want to fight for Allah but I do not know a safe way and I do not have a sponsor in the land of the Caliphate. We are brothers in faith. Please advise me on what to do. May Allah reward you well." In the screenshot of the conversation, the Al Faris Media Institute responded, "[P]eace be on you too … There are no battles for the sake of Allah in either Iraq or Syria … If you really want that, do jihad where you live."

Later, on September 5, 2023, SAID, using another of his Facebook accounts, stated, "Brother, if I was living alone, you would have heard that I conducted an operation like 9/11. But my family is with me and I don't want to put them in trouble." SAID is known to reside with his mother and brother. About a month later, on October 9, 2023, SAID, using another of his Facebook accounts stated in a communication, "If I had weapons, I would have beaten the Jews and Americans in their backyards, but unfortunately, I am prohibited from purchasing a weapons license because of their suspicion of me… I only brought a dagger." About a week later, SAID, using one of his Facebook accounts, sent a communication in which he

praised a "Tunisian brother" who "killed three Swedes in Belgium in retaliation for burning the Holy Qur'an."  SAID stated that the individual was a martyr.[8]  On that same day and on the same Facebook account SAID followed up with postings about acquiring a firearm.  A day later, SAID posted again on the same Facebook account that, "Inshallah Allah will let us marry in Jannah… It's time for jihad… bye habibti[9]… if Muwahid ask you for marriage please accept I beg you again, bye I will leave forever."

### SAID's Efforts to Travel to Join ISIS Forces or Attack Domestically

The same records obtained from Meta for SAID's Facebook accounts also revealed numerous communications in which SAID expressed his desire to travel internationally to join ISIS forces.

On May 28, 2023, SAID, using one of his Facebook accounts, sent a message to another Facebook user about how he would travel to meet up with ISIS.  SAID showed that he had put thought in how he would travel, "I will be happy with a smile on my face. I am not coming to declare jihad alone … There are many tourists with

---

[8] On or about October 16, 2023, a Tunisian national, identified by Belgian media outlets as Abdelsalem Lassoued, used an assault rifle to shoot and kill two Swedish nationals and injure a third Swedish national in Brussels, Belgium. Following the attack, the shooter fled and released a video message in which he self-identified as Abdelsalam Al Guilani and stated in Arabic that he is a fighter for Allah and is from the Islamic State. The shooter was later shot dead by police. ISIS claimed responsibility for the attack.

[9] Habibti is an Arabic term which literally translates to my love, my dear, my beloved or my darling.

longer beards than me.  I don't know why you are worried? … how would they know I am a supporter."  As the conversation continued on Facebook that day, SAID stated to another user:

> My mother will not go travel because she decided never to go to Lebanon. My brother is hesitant because his situation in Lebanon is very difficult … I told them that after I go to Egypt, I can strive for the sake of Allah… Unfortunately, [my mother] is not a supporter [of ISIS] although I've tried many times with her … The chances now in Egypt are high because very soon Africa will be Islamic land and if there is a chance to go to Lebanon, are you going to come with me?

On or about July 4, 2023, SAID, using Facebook, sent a series of images to another Facebook user which appeared to depict conversations on Facebook Messenger in which SAID sent requests to approximately five individuals with the same or similar language "I have a request. I want to fight for the sake of Allah but I do not know the safe way to do that and I have no one to sponsor me in the Caliphate. Can you help and advise me on what to do. May Allah reward you well." That same day SAID sent another message to user on Facebook asking about traveling for jihad, in which SAID stated, "Question. Why don't we go to Palestine? Things may be hard in other states … Palestine is the land for jihad … Just a question. I just want to know … If fighting for the sake of Allah is hard in the other welayat[10], then Welayet Beit al-Maqdis[11] is a better option."

---

[10] A "wilayat" is a province under the governance of ISIS.
[11] Ansar Bayt al-Maqdis was originally an al-Qaeda affiliate, around 2014 it pledged its allegiance to ISIS and became known as the ISIS - Sinai Province.

9

Later around July 29, 2023, SAID wrote in a message with another Facebook user that he (SAID) had tried many times to do hijrah to Iraq or Syria but the brothers told him it was not possible. SAID indicated that he was instead considering whether making hijrah to Africa would be easier.[12]

**<u>Said's November 2024 Interview</u>**

During SAID's interview on November 8, 2024, he was asked what the different names of ISIS are. He included ISIL and Dawlah. (Interview at 16:00). When asked if he knew the United States considered ISIS to be terrorist organization he said, "yes." (Interview at 24:00-26:00). SAID also states there is a group for designing and the owner, Abu Hamman, goes by Dawlawi[13] Designer. (Interview 40:50-42:00). When asked if Dawlawi Designer means Islamic State designer, he responds, "yeah." He goes on to tell the FBI that the Dawlawi Designer is a supporter and supports the Islamic State from the outside. (Interview 43:15). He is not a fighter. (Interview 43:30). According to SAID, the Dawlawi Designer also encouraged the people within the group to improve skills in designing media to support Jihad and improve skills to help the media. (Interview 44:30-46:00). SAID said, he thinks people stick with ISIS official media; however, SAID in the interview also admitted

---

[12] ISIS supporters use the word "hijrah" to describe traveling to ISIS-controlled areas in order to join ISIS and wage violent jihad.
[13] "Dawlawi" is a reference to the "Dawlah," or the "Islamic State," an alias of ISIS.

to translating official ISIS news into English and Indonesian about two years prior to the interview. (Interview at 27:00-29:30, 47:00-48:00). When the analyst asked SAID why he took official ISIS propaganda and made it his own, SAID said it was more active than reading (unintelligible). (Interview 54:30-55:00). SAID translates a part of his media, correcting the FBI's translation, stating the correct translation is, "target the crusaders in their country wherever you find them." (Interview 59:00-1:00).

Additionally, during his interview, SAID admits to twice attempting to join ISIS to fight, once to Egypt and once to Syria. (Interview 1:04-1:05:45). He could not travel to fight, because it is difficult to get there, he supported ISIS through media. (Interview 1:05:30-1:06:50).

Later in the interview, SAID responds to investigator's question that the message is, if there is someone fighting Islam, you should kill him and he responds, "yes." When asked if that is the message he wanted to put out, he says "yes."

## CONTEXTUAL BACKGROUND

In addition to the fact that SAID's communications with the Designer and others are direct evidence that he attempted to work under ISIS's direction and control, understanding ISIS's current media operations are key to understanding whether SAID's efforts were coordinated with ISIS. For example, ISIS operates in an evolving world and has thus updated its tactics with the changing conditions.

11

Experts opined in 2018, around the time the FBI started investigating SAID, that ISIS seemed "to have taken its foot off the official media pedal to instead put more effort into the logistics side of its insurgent equation." Charles Winter, Jade Parker, *Virtual Caliphate Rebooted: The Islamic State's Evolving Online Strategy*, Lawfare, January 7, 2018, https://www.lawfaremedia.org/article/virtual-caliphate-rebooted-islamic-states-evolving-online-strategy. Roger Patterson also noted that, "[t]he output of official ISIS propaganda severely declined during the last few months of 2017, only to rebound in early 2018." Patterson, *ISIS "Virtual Caliphate:" What is a Virtual Caliphate?*, Justice Clearinghouse, April 18, 2018, https://www.justiceclearinghouse.com/resource/isis-virtual-caliphate-danger-in-our-communities-2/. Further, "in contrast to bygone years, which saw the brunt of the Islamic State's online activities being borne on the shoulders of official operatives, the lion's share of this new effort appears to have been left to the organization's increasingly important legion of online supporters-cum-volunteer media operatives, which it refers to as the *munasirun*." Winter, Lawfare (2018). "The distinction between official and unofficial material and operations has begun to blur, a development that means we need to revisit previous attempts to map the caliphate's online ecosystem." *Id*. It is also "helpful to consider these diffuse efforts as four overlapping subsystems: official media amplification, unofficial media production, ideological incubation, and logistics and facilitation. While

aspects of these categories may appear to be new, each of these spheres of activity is the product of gradual evolution, not revolutionary innovation." *Id.* The proliferation of prior media is like an album akin to ISIS's "greatest hits." *Id.* Whereas prior to 2018, the Munasir amplifiers were not as important, their role has changed. also create unofficial media productions and "there is evidence this type [of] content is being regulated by official ISIS media operatives." *Patterson* (2018). In 2018, when Patterson wrote the article, he explained that "Munasir are playing a role in providing a stream of tactical guidance for those inspired to conduct attacks[]" and "these reference materials showcase and instruct a host of tactics that are being used by homegrown terrorists including in the United States." *Id.* Winters and Parker also explain that munasir-run channels "offer constant streams of tactical guidance for independently-motivated actors." Winters, Lawfare (2018). They explain that [t]he content ranges from bomb and poison recipes to theological advice and back issues of *Dabiq*, *Rumiyah*, and the al-Qaeda magazine, *Inspire.* Through distributors such as these, which appear to operate with official sanction—and, at times, direction—from the Islamic State, the virtual caliphate is seemingly being used to plug the logistical gap left by the absence of its official publications." *Id.*

In sum, even in 2018, "[w]ith respect to the first prong, amplification, munasir networks are more important than they have ever been. Indeed, without them, the media arm of the Islamic State would have been silenced long ago." *Id.*

## SUMMARY OF ARGUMENT

1. The government respectfully requests that the Court reject SAID's first argument because both his conduct and speech are properly proscribed even with the increased burden on content-based restrictions to speech.

2. The government respectfully requests the Court reject SAID's second argument because the Supreme Court has already determined the relevant statutory definitions require a fact (evidentiary) analysis and the definitions are something a person of normal intelligence could understand.

## ARGUMENT

### A. The indictment complies with both the First and Fifth Amendment.

Section 2339B prohibits "knowingly provid[ing] material support or resources to a foreign terrorist organization, or attempt[ing] or conspire[ing] to do so[.]" As noted above, the Indictment charges SAID with violating section 2339B by providing personnel (himself) and services, including producing videos and propaganda.

The defendant's arguments track arguments previously presented and subsequently denied by the Supreme Court and multiple Circuit Courts. The government is respectfully requesting that this court follow course and deny the defendant's motion because (1) SAID's proliferation of ISIS's message in order to support their cause is not protected by the First Amendment; and (2) criminal

14

coordination is a fact-dependent determination that does not render a statute unconstitutionally vague as-applied.

*1. The defendant engaged in unprotected speech*

The "Government's interest in combating terrorism is an urgent objective of the highest order. . ." *HLP*, 561 U.S. at 28 (referencing the parties' agreement as to the Government's interest as opposed to the plaintiff's argument that this objective does not justify prohibiting their speech). Courts have historically provided that, "[c]ontent-based restrictions on speech" be "permitted" only in rare circumstances such as, "incitement, obscenity, defamation, speech integral to criminal conduct, so-called 'fighting words,' child pornography, fraud, true threats, and speech presenting some grave and imminent threat the Government has the power to prevent." *United States v. Alvarez*, 567 U.S. 709 (2012). And even though the Court "must apply a more demanding standard" on the "content-based regulation of speech," that regulation passes muster when contemplating SAID's speech in support of ISIS. *HLP*, 561 U.S. at 27.

Although some of SAID's speech could also be analyzed under a true threat analysis, his charged conduct and speech is properly proscribed consistent with the First Amendment when it is "advocacy performed in coordination with, or at the direction of, a foreign terrorist organization." *Id.* at 26. It is not an exempted class of conduct under the material support statutory framework. Indeed, the Supreme Court

in *HLP* ruled that when material support takes the form of speech, "the statute is carefully drawn to cover only a narrow category of speech, to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Id*.

Following the guidance of the Supreme Court in *HLP*, the Fifth Circuit applied a similar First Amendment analysis in *United States v. Rahim*. In that case, Rahim argued "that his activities on Zello did not amount to providing material support to ISIS." *United States v. Rahim*, 860 F. App'x 47, 52 (5th Cir. 2021). Rahim argued "that he was 'nothing more than a morally corrupt cheerleader,' and that his statements were 'merely idle banter' and "independent advocacy," thus constituting protected speech under the First Amendment. *Id*. ("Independent advocacy that might be viewed as promoting the group's legitimacy is not covered [under § 2339B].""). *Id*. at 52–53. Rahim, however, conducted various proscribed activities, he was an "active leader on the channel," he attempted to provide both himself and other individuals to work under ISIS's direction or control[,]" and he "repeatedly instructed users to join ISIS by either traveling to the Caliphate and fighting there, or committing attacks on behalf of ISIS in other countries." *Id*. Given the facts, the Fifth Circuit found that a "jury could reasonably infer that Rahim's activities" consisted of "an attempt to provide material support to ISIS." *Id*. at 52.

Rahim also argued that the government failed to establish "that he conspired with Dawla or other persons to provide material support to ISIS." *Id*. at 53. Asserting that he was simply "chatting with 'like-minded individuals" and the government did not prove a "meeting of the minds." *Id*. However, the Fifth Circuit denied this argument, clarifying that "[a]n agreement to conspire 'may be inferred from a 'concert of action' or from 'the development and collocation of circumstances.'" *Id*. citing *United States v. Bams*, 858 F.3d 937, 945 (5th Cir. 2017) (citation omitted).

Similarly, the government requests this court find the defendant's conduct is properly proscribed and not independent advocacy given that SAID attempted to travel overseas to join ISIS and when he could not do that, he decided to support ISIS in a different manner, by creating ISIS propaganda at the direction of and in coordination with an individual SAID believed to be an ISIS media official.

2. *The Statute, as-applied to the defendant's case, complies with the Fifth Amendment.*

The statue is not unconstitutionally vague as-applied to all cases charged under section 2339B involving the criminal coordination with an FTO.

The Supreme Court has ruled that service "refers to concerted activity, not independent advocacy.'" *HLP* at 23 (cleaned up). Similar to SAID's case, in *HLP*, "[p]laintiffs argue that this construction of the statute poses difficult questions of exactly how much direction or coordination is necessary for an activity to constitute a "service." *HLP*, 561 U.S. at 24 (citations omitted). The Court references Webster's

Third New International Dictionary which defines "'service' to mean 'the performance of work commanded or paid for by another: a servant's duty: attendance on a superior'; or 'an act done for the benefit or at the command of another'). *Id.* at 23-24 (edition 2075 (1993)). Further clarifying that "context confirms that ordinary meaning here. The statute prohibits providing a service '*to* a foreign terrorist organization.'" *Id.* at 23-24. The Court found that "a person of ordinary intelligence would understand that independently advocating for a cause is different from providing a service to a group that is advocating for that cause." *Id.*

In *HLP*, the Supreme Court declined to provide a bright-lined response to plaintiff's questions regarding the extent of the statute's required relationship, because they were "completely hypothetical." *Id.* at 25 (Would any communication with any member be sufficient? With a leader? Must the 'relationship' have any formal elements, such as an employment or contractual relationship? What about a relationship through an intermediary?). In fact, the Court did not disavow the statue as vague, but rather opined that the decision of constitutionality was fact-dependent and "and so adjudication of the reach and constitutionality of [the statute] must await a concrete fact situation.'" *Id.*

The defendant's motion states, "[t]he vagueness problem here is definitional, not evidentiary: the statute does not define, and no court has defined, how much connection between a defendant and an FTO is required to convert independent

expressive activity into prohibited 'concerted activity.'" Dkt. No. 46 at 21. Framed this way, SAID's argument that the statutory vagueness problem is definitional without an evidentiary argument is at odds with Supreme Court precedent.

Recently, in *United States v. Carpenter*, the Sixth Circuit found that Carpenter's claim faced "the same fate as prior vagueness attacks on § 2339A–B." *United States v. Carpenter*, 157 F.4th 841, 848 (6th Cir. 2025), *cert. denied,* No. 25-6946, 2026 WL 858437 (U.S. Mar. 30, 2026). In *Carpenter*, a "federal agent asked Carpenter to help translate his ISIS videos, [and] Carpenter facilitated their translation." *Id*. Carpenter "understood that his efforts would help ISIS spread its message." *Id*. at 848–49. The Court determined that the statute provided "all the notice a reasonable person would need to know that this support to a foreign terrorist organization would violate the law[]" even though the translation service was not specifically listed, but rather included in the general phrase "service." *Id*.

Likewise, in the Seventh Circuit, the Court rejected defendant's argument that Section 2339B was unconstitutionally vague. *Osadzinski*, 97 F.4th at 493. "Here, the record makes clear that Osadzinski engaged in conduct 'clearly proscribed' by Section 2339B." *Id*. In that case, Osadzinski provided "computer script that duplicated troves of ISIS propaganda to circumvent the censorship of ISIS media online." *Id*. The Court had "no difficulty concluding" his "actions qualified as a 'service' that materially supported ISIS." *Id*.

In *HLP*, although the groups were attempting to materially support terrorist organizations, and in doing so, were potentially assisting the terrorist activities, the assistance was not facially nefarious. Nevertheless, the Supreme Court found that "[t]he material-support statute, in its application to plaintiffs, "provide[s] a person of ordinary intelligence fair notice of what is prohibited." *HLP*, 561 U.S. at 18 (citing *United States v. Williams*, 553 U.S. 285 (2008)). SAID's activities were facially more concerning than those considered in *HLP*'s inquiry. The Designer represented himself as the "number 2" media official for ISIS and SAID acknowledged that he understood this while he was creating, editing, and seeking to disseminate the ISIS propaganda he created at the Designer's direction.

Defendant also references *Ullah*, which is not binding precedent on this Court. But even in *Ullah*, the Second Circuit found distinguished the case of an individual who is inspired by but acts independently of an FTO, and an individual like SAID, who attempted to work at the direction of and in coordination with ISIS and its officials, like the Designer:

> In *United States v. Farhane*, we upheld the conviction of a doctor who met with purported al Qaeda members, swore allegiance to al Qaeda, promised to be on-call in Saudi Arabia to treat wounded al Qaeda members, and provided his phone numbers for al Qaeda members to reach him for treatment. 634 F.3d 127, 149 (2d Cir. 2011). In *United States v. Pugh*, we upheld the conviction of a U.S. citizen who consumed ISIS propaganda but then, rather than carrying out a lone-wolf attack, attempted to cross from Turkey to Syria to join ISIS. 945 F.3d 9, 20–21 (2d Cir. 2019). And in *United States v. Alebbini*, the Sixth Circuit upheld the conviction of another person who attempted to travel

to Syria to serve as a solider for ISIS. 979 F.3d 537, 549–50 (6th Cir. 2020). *United States v. Ullah*, 173 F.4th 399, 420 (2d Cir. 2026).

In addition to *Ullah*, the Second Circuit has also opined, in an unpublished decision, that, in addition to "training aspiring jihadist in the use of guns and knives," "[a] person of ordinary intelligence would also know that creating and maintaining websites that host training manuals and propaganda for jihadist organizations and provide instructions for making explosive devices and other weapons, is similarly prohibited." *United States v. Mustafa*, 406 F. App'x 526, 530 (2d Cir. 2011) (trial document citations omitted). The Court also states that Section 2339B "provides explicit standards for those who apply it[,]" because it provides definitions of its relevant terms." *Id.* citing to *Linares Huarcaya,* 550 F.3d at 231 (internal citations omitted).

Ultimately, the defendant's specific argument, that the as-applied challenge is one of definitional vagueness should be denied as it is at odds with Supreme Court precedent.

## CONCLUSION

Given the statute, relevant case law, and the evidence in this case, the government requests that the Court deny the defendant's constitutional challenges.

Respectfully submitted,

JOHN G.E. MARCK
ACTING UNITED STATES ATTORNEY

By:_____
Liesel Roscher
Assistant United States Attorney
1000 Louisiana St., Suite 2300
Houston, Texas 77002
Telephone: 713-567-9000
Facsimile: 713-718- 3300

## CERTIFICATE OF SERVICE

A copy of this Response was served on counsel for defendant via e-filing on June 3, 2026.

By:_____
Liesel Roscher
Assistant United States Attorney